

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 2-08-407-CV

IN THE INTEREST OF A.C., JR., A CHILD

------------

FROM THE 89TH DISTRICT COURT OF WICHITA COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellant Carol[2] appeals from the trial court's order terminating her parental rights to her son, Abraham. In three points, she complains about the trial court's sua sponte severing the petition in intervention filed by one of Abraham's former foster parents, and in a fourth point, she claims that the trial

---

[1] *See* Tex. R. App. P. 47.4.

[2] For purposes of maintaining confidentiality, we will refer to all parties by fictitious names. *See* Tex. R. App. P. 9.8; Tex. Fam. Code Ann. § 109.002(d) (Vernon 2008).

court's finding that termination was in Abraham's best interest is factually insufficient. We affirm.

## I. Background Facts

The Department of Family and Protective Services (DFPS) removed two-year-old Abraham from his mother's care because it was concerned that she was not properly treating an MRSA[3] infection in his leg bone for which he had been prescribed at-home intravenous antibiotics. A nurse at Cook Children's Hospital in Fort Worth had called DFPS after Carol failed to take Abraham to two follow-up appointments regarding his leg and after a home health care service that had been assisting Carol with Abraham reported that Abraham had developed an infection in his IV's central line.

When the DFPS investigator arrived at Carol's then-current residence, Abraham was not able to support any weight on the leg, could only walk by dragging the side of his foot on the injured leg, and was not wearing any protective covering on the leg. Carol told the investigator that she had missed the appointments at Cook Children's because her transportation fell through.[4]

---

[3] MRSA stands for methicillin resistant staphylococcus aureus, or antibiotic resistant staph.

[4] Carol and Abraham lived in Wichita Falls. At the time of trial, Carol had never owned a car and did not have a driver's license. Although Carol had received money for transportation from Medicaid, she said she missed at least one appointment because the woman who was supposed to take them had

2

The investigator took Carol and Abraham to the emergency room at United Regional Hospital in Wichita Falls; the hospital sent Abraham to Cook Children's in Fort Worth the next day via CareFlite. According to the DFPS investigator, Abraham had a severe infection in his leg bone and was on the verge of losing his leg and becoming septic. Abraham's medical records indicate that Carol had failed to give Abraham twelve doses of his IV antibiotics at home.[5]

Abraham stayed at Cook Children's for approximately three months. Carol stayed with him during that time. Medical records from the beginning of Abraham's stay indicate that Carol suffered from migraines; that she slept in late with Abraham, sat on a chair in his room, and did not play with him; and that she did not supervise him adequately, allowing him to walk on his leg without his "boot" and climb on a wheelchair in the room, and failing to put him in his crib when she left the room so that he would follow her. However, later medical record entries show that after Carol received pain medication and medical treatment, she became more engaged with Abraham.

---

been jailed and she could not secure other transportation.

[5] The DFPS investigator had asked Carol for all the medication when she took Abraham and Carol to United; Carol gave her several unopened boxes and an opened box of IV bags.

3

Before Cook Children's discharged Abraham, DFPS filed a removal petition in Wichita County.[6] It alleged that Abraham would require long-term oral antibiotic therapy, have to wear a cast and boot, and need continued follow-up visits to Cook Children's.[7] Because of Carol's past problems with caring for Abraham's condition[8] and her inability to obtain transportation to Fort Worth, DFPS alleged that Carol could not adequately care for Abraham's medical needs upon his discharge from the hospital. The trial court signed an order naming DFPS Abraham's temporary sole managing conservator.[9] DFPS placed Abraham with Dorothy, a foster parent who was licensed to care for children with special medical needs.[10] It also developed a service plan for Carol, which the trial court incorporated into temporary orders.

---

[6] The petition states that reunification was DFPS's goal but also pled in the alternative for termination of both Carol's and Abraham's alleged father's parental rights.

[7] The infection had gotten so severe that it caused several fractures in Abraham's leg bone.

[8] DFPS also alleged that it had received prior referrals for Carol regarding medical neglect of two of her other children and that Abraham had been born with marijuana in his system.

[9] Carol was not married to Abraham's alleged father, and it is not clear from the record whether he and Carol lived together on a consistent basis.

[10] Abraham had bone graft surgery on April 24, 2008. He also had to wear a bone stimulator.

The trial court initially set a termination hearing for March 31, 2008, almost one year after Abraham's removal on April 5, 2007. *See* Tex. Fam. Code Ann. § 263.306(a)(12) (Vernon 2008). But after the State moved to extend the dismissal deadline, the trial court extended the dismissal date to October 4, 2008, one year and one hundred eighty days after Abraham's removal. *See id*. § 263.401(a).

Dorothy[11] filed a petition in intervention on July 17, 2008. She alleged that her interests were aligned with DFPS, and she sought termination of both parents' rights, and, in the alternative, that she be named Abraham's permanent managing conservator. The trial court set a hearing on the petition in intervention for September 30, 2008 but also ordered the parties, including Dorothy, to mediate before the hearing. It is unclear from the record whether the mediation actually occurred.

The trial court then transferred the case to the appointed associate judge for the newly-created "Child Welfare Court" for Wichita County. At the scheduled September 30 hearing on the petition in intervention, the associate judge allowed the intervention and proceeded to hear the termination case.

---

[11] Dorothy is the first foster parent with whom Abraham was placed. DFPS removed Abraham from her home after she left Abraham with a babysitter who failed to properly supervise him.

5

However, during the DFPS caseworker's testimony, the associate judge realized that the attorney general's office in Wichita Falls, for whom she had previously worked, had participated in the case with respect to the alleged father's child support obligations.  Accordingly, the presiding judge of the 89th District Court, in which the case had originally been filed, rescinded the transfer order and continued the termination trial until October 3, a Friday, the next-to-last day before the one-year deadline.[12]

Before beginning the proceedings on October 3, 2008, the trial court announced,

> I've reviewed the file.  I've reviewed the medical records.  I reviewed a good portion of the [DFPS] records.  I've come to the conclusion that we can try the termination part of this lawsuit without prejudice to the intervenor in this matter.  And, in fact, there's a possibility we can even pick up – if the notice is okay on it – with continuation of getting into the intervention as early as next week, if our trial docket falls through.
>
> I fail to see where any party would be prejudiced by doing this, and I think that in the interest of justice in getting to the bottom of this with [DFPS's] claims and those of the other parties, and in the absolute best interest of [Abraham], that I am severing out [sua] sponte the intervention of [Dorothy] . . . .

___

[12] An email in the clerk's record notes, "BECAUSE OF THE DROP DEAD DATE OF 10-04-08 WE HAVE CANCELED EVERYTHING FOR 10.03.08 AND THE CASE HAS BEEN RESET TO FRIDAY 10-03-08 TO BEGIN AT 8:30 AM."

6

Carol's counsel objected on due process grounds, claiming a lack of notice and the opportunity to be heard and further arguing that the court could not sever the case so close to trial. Counsel additionally claimed that Dorothy was a necessary party because the court could decide to name Carol a joint managing conservator or possessory conservator along with her. *See* Tex. R. Civ. P. 41. Dorothy objected on the ground that she was a necessary party; in other words, both Carol and Dorothy claimed that the trial court could not decide to terminate Carol's parental rights or allow Carol some kind of visitation, possession, or conservatorship without Dorothy being a party to the case. The trial court overruled the objections and trial began.

After hearing all the evidence—including Dorothy's testimony that if she were named Abraham's managing conservator, she would allow Carol and Abraham's siblings to have supervised visitation—the trial court terminated both parents' rights to Abraham and named DFPS Abraham's permanent managing conservator. But it also ordered that Carol be allowed twice monthly supervised visits with Abraham for up to two hours each visit. The court noted,

> [A]ll of this is without any kind of prejudice to any further rulings or any further parties, specifically, the intervention, and the question as to the possible adoptive parents. . . . I did not intend to deal with that issue today. The evidence [that] was offered and proffered into evidence, I'm certain will be offered at the time the intervention portion

7

is tried.  And that can come about at any time that you-all can get time with the Court, and notice to the parties.

Carol filed a motion for new trial, which the trial court denied.  Only Carol appealed from the trial court's order.

## II.  Propriety of Severance of Petition in Intervention

Carol's first three points challenge the propriety of the intervention on three grounds:  (1) that the severance violated her Fourteenth Amendment due process rights because of a lack of notice and opportunity to be heard; (2) that the severance violated her Fourteenth Amendment due process rights because her and Dorothy's positions were "interwoven, consistent and supportive of each other"; and (3) that the trial court abused its discretion by severing because Dorothy was a necessary and indispensable party to the litigation.

### A.  Applicable Law

Rule of civil procedure 41 reads, in pertinent part:

> Parties may be dropped or added, or suits filed separately may be consolidated, or actions which have been improperly joined may be severed and each ground of recovery improperly joined may be docketed as a separate suit between the same parties, *by order of the court on motion of any party or on its own initiative at any stage of the action, before the time of submission to the jury or to the court if trial is without a jury, on such terms as are just*.  Any claim against a party may be severed and proceeded with separately.

Tex. R. Civ. P. 41 (emphasis added).

8

A severance splits a single suit into two or more independent actions, each action resulting in an appealable final judgment. *Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 383 (Tex. 1985); *Aviation Composite Techs., Inc. v. CLB Corp.*, 131 S.W.3d 181, 188 (Tex. App.—Fort Worth 2004, no pet.). Severance of claims under the Texas Rules of Civil Procedure rests within the sound discretion of the trial court. *Liberty Nat'l Fire Ins. Co. v. Akin*, 927 S.W.2d 627, 629 (Tex. 1996) (orig. proceeding); *Aviation Composite Techs.*, 131 S.W.3d at 188. A claim is properly severable if (1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted, and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990) (op. on reh'g); *Aviation Composite Techs.*, 131 S.W.3d at 188. The controlling reasons for a severance are to do justice, avoid prejudice, and further convenience. *Guar. Fed. Sav. Bank*, 793 S.W.2d at 658; *Aviation Composite Techs.*, 131 S.W.3d at 188.

A trial court is not required to provide prior notice of its intent to sever, and, in most cases, it need not hold an evidentiary hearing before severing. *Aviation Composite Techs.*, 131 S.W.3d at 187–88; *see WorldPeace v.*

9

*Comm'n for Lawyer Discipline*, 183 S.W.3d 451, 461 n.11 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).[13]

## B.    Analysis

Here, the trial judge was faced with a looming section 263.401 dismissal deadline when he had to retake the case from the associate judge.  Tex. Fam. Code Ann. § 263.401.  He was left with one day to try the case.  Thus, it is clear from the record that his decision to sever the intervention was made in light of those scheduling constraints.

Although Dorothy's petition states that she is aligned with DFPS and seeking termination and eventual adoption or permanent managing conservatorship, Carol's counsel informed the trial court, and Dorothy later testified, that she would have no objection to Carol having visitation.  Thus, Carol based her objection to the severance at trial on—and urges on

---

[13] The cases Carol cites to support her contention that "a trial court cannot make a decision to sever a matter simply on the live pleadings" are inapposite.  Two involve insurance companies opposing a trial court's refusal to sever first-party contractual and bad faith claims without first hearing evidence of prejudice, a potential fact issue related to severance in those particular type of cases.  *See, e.g., Allstate Ins. Co. v. Hunter*, 865 S.W.2d 189, 194 (Tex. App.—Corpus Christi 1993, orig. proceeding); *Progressive County Mut. Ins. Co. v. Parks*, 856 S.W.2d 776, 780 (Tex. App.—El Paso 1993, orig. proceeding).  Here, the fact issues to be resolved relate to the ultimate issues in the case, not to the factors governing the propriety of severance.

10

appeal—the ground that Dorothy's wishes that Carol have visitation had bearing on whether termination would be in Abraham's best interest. It is not clear from the record, however, that Dorothy had entirely abandoned her claim for adoption. Thus, the intervention clearly had at least two distinct claims: for permanent managing conservatorship and, in the event of termination, adoption.

Additionally, Dorothy was able to testify at trial about her background and qualifications, why Abraham was removed from her home, and her wishes for Carol, Abraham, and Abraham's siblings to have contact in the future. In fact, the trial court ordered post-termination supervised visitation for Carol.

Dorothy had standing to intervene because of her possession of Abraham for a twelve-month period ending not ninety days before the filing of the intervention. *See* Tex. Fam. Code Ann. § 102.003(a)(12) (Vernon 2008). Thus, she also had standing to maintain her own suit. *See id*.; *In re N.L.G.*, 238 S.W.3d 828, 829 (Tex. App.—Fort Worth 2007, no pet.).

Moreover, the severed claims were not so interwoven with the termination suit that they could not be tried separately. The trial court was effectively able to try the termination part, hearing evidence as to the propriety of either retaining Carol as a possessory conservator or terminating her rights. Nowhere was unsupervised visitation between Carol and Abraham advocated, including by Dorothy. The trial court also heard evidence as to the propriety of

11

a future placement of Abraham with Dorothy. The court told the parties that it intended to try the adoption issues as soon as possible. And, although the trial court stated that it anticipated the parties would introduce much of the same evidence that it had heard in the termination proceeding, the fundamental issues are ultimately different. Evidence that Abraham was adoptable by either Dorothy or the then-current foster family, or that Dorothy was willing to allow Carol supervised visitation, went to the issue of whether Carol's parental rights should be terminated. But evidence as to which of the two adoptive placements would be ultimately in Abraham's best interest was not necessary to determine the impact of Carol's having continued parental rights in light of her inability to provide Abraham a stable, permanent home environment. *See* Tex. R. Civ. P. 41; *cf*. Tex. R. Civ. P. 39(a) (requiring joinder if disposition of action in party's absence would result in substantial risk of existing parties incurring inconsistent obligations).

Accordingly, we conclude and hold that the trial court did not abuse its discretion by severing Dorothy's petition in intervention and that the severance did not harm Carol. *See* Tex. Fam. Code Ann. § 162.001(b)(1) (Vernon 2008) (providing that termination is required for child to be adopted); *cf. In re A.G.C.*, 279 S.W.3d 441, 448 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding that termination via affidavit of relinquishment is not available only in

12

anticipation of adoption, reasoning, in part, that termination and adoption chapters of family code are separate); *Hunter v. NCNB Tex. Nat'l Bank*, 857 S.W.2d 722, 725–26 (Tex. App.—Houston [14th Dist.] 1993, writ denied) (holding that trial court had discretion to sever claims involving trust's alleged ownership interest in home from declaratory judgment claim regarding appellant's alleged homestead interest in home because homestead rights had to be determined regardless of whether house belonged to trust or guardianship estate of appellant's mother). Furthermore, because prior notice and an evidentiary hearing are not required, and because Carol was given the opportunity to be heard on her objections, we conclude and hold that her due process rights were not violated. We overrule her first three points.

### III. Best Interest Finding

In her fourth point, Carol challenges the factual sufficiency of the trial court's finding that termination of her parental rights was in Abraham's best interest.

### A. Standard of Review and Applicable Law

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547

13

(Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon Supp. 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

Termination decisions, including the best interest finding, must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2002). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96

14

S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2002). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

> (1) the child's age and physical and mental vulnerabilities;

> (2) the frequency and nature of out-of-home placements;

15

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by DFPS or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

16

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

17

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive. Some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Application of Factors to Evidence

DFPS's main concern about Carol was that she had failed to demonstrate that she could provide a stable home and permanence for Abraham, which his caseworker and the CASA advocate testified he needed most. Abraham was two at the time of his removal and almost four when Carol's rights were terminated. Although his leg was doing well and he had been able to wear two shoes for the first time since his infection, he still had physical needs to be addressed, and there was still a chance he would have to have additional

18

surgeries. He still had follow-up doctor's visits. The CASA advocate and DFPS caseworker both testified that Abraham's need for permanence was paramount.

Although Abraham had never been removed from Carol's care before[14] and did not need to remain on IV antibiotics when he left the hospital, DFPS nevertheless petitioned for removal because of Carol's past neglect and the severity of the infection that led to him being admitted to the hospital. Before he was admitted, he was in danger of becoming septic and losing his leg, and he had to be sent to Cook Children's via CareFlite from the Wichita Falls emergency room. The DFPS investigator testified that despite this, Carol told her at the time that Abraham was doing ok. Carol admitted that when her friend who was going to drive her to Cook Children's for Abraham's followup visits went to jail, she still had the money Medicaid had given her for transportation, but she said she could not get anyone else to take her. When asked about the bus, she said they wouldn't allow Abraham on the bus because of his health condition. Carol did not keep in contact with Abraham's doctors. DFPS was concerned because she had not demonstrated an understanding of how important Abraham's followup care was.

---

[14] The omissions that initially prompted Abraham's removal did not recur because Carol failed to work her service plan and did not regain custody of Abraham.

19

The evidence showed that Carol was a chronic marijuana user, which she acknowledged. She admitted smoking marijuana when she was pregnant with Abraham and another of her children. Carol failed at least one drug test required by her service plan and refused to take another. In fact, her drug use led to her probation being revoked while Abraham was in DFPS's care; she was not able to visit Abraham for the two months she was in jail. Carol told DFPS she had been going to a treatment facility before trial, but she did not provide any proof of her attendance, and the center would not confirm whether she had been attending. The CASA advocate testified that narcotics use can affect a person's ability to parent by affecting judgment, motivation, and motor skills.

Between the time of removal and trial, Carol had lived in four different places: her aunt's house, the Budget Inn,[15] a rental house, and the Deluxe Inn. She acknowledged that the motels were not safe for her children but said these places were all she could afford.[16] Carol testified that she had been working at Sonic for eight months and that she made $260 per month after she paid child support. Although there was some testimony that Abraham's father was at the house when a DFPS worker came by one time, there is no evidence

---

[15] Carol testified that her other children lived with a cousin while she was living at the Budget Inn.

[16] The caseworker testified that Carol was on a waiting list for housing and was scheduled to get housing the month after trial.

about whether he lived with the family or provided any support. Abraham's father told the DFPS worker that he did not want anything to do with the case.

Abraham was in DFPS's custody for eighteen months. While Abraham was in DFPS's custody, Carol failed to maintain regular contact with him. She testified that she made about thirteen visits. According to Carol, she could not make every visit because of her other children. But the DFPS caseworker testified that DFPS provided Carol with transportation and that Carol was allowed to bring the other children. According to the caseworker, between November 2007 and the time of trial on October 3, 2008, Carol visited Abraham four times, once on the day before trial. The CASA advocate testified that the inconsistency of Carol's visits was harmful to Abraham.

There were no psychological test results introduced at trial. Carol had failed to attend the counseling appointments and take the psychological tests recommended in her service plan. She acknowledged at trial that she had failed to do so.

Carol also failed to attend any parenting classes as required by her service plan. DFPS was concerned that she did not know how to meet Abraham's medical and emotional needs, as evidenced by the need for Abraham's admission to Cook Children's, Carol's failure to visit him regularly when he was in DFPS's custody, and her failure to complete her service plan. The CASA

advocate testified that neither parent had demonstrated that he or she understood parenting. The DFPS caseworker agreed, however, that Carol was young and immature and that people can mature over time.

No evidence indicated that Carol or the children's father had been assaultive toward Abraham or his siblings. But the removal petition alleged, and the caseworker referred to in her testimony, that Carol had a prior history with DFPS. The results of that history were not introduced.

Carol testified that Abraham told her he wanted to come home. But the caseworker testified that Abraham cried during at least one of Carol's visits. She also testified that it appeared Carol and Abraham no longer had a bond. The CASA advocate testified that they appeared uncomfortable and did not interact very much; Carol tried but she gave up when Abraham acted indifferently toward her and chose to play independently. She also testified, however, that Abraham would interact with his siblings.

The caseworker testified that Carol had referred a potential placement for Abraham to her but that the woman was not suitable because she had a prior DFPS history. Additionally, a relative of the father's called and asked about the case, but "that was it." That relative had a prior history too. According to the caseworker, there were no other potential placements from the father's family.

22

Dorothy testified that she had cared for twenty-two children through DFPS. She was a licensed vocational nurse; sometimes DFPS would place children with significant medical issues with her. She testified that Carol was very nice and sweet and that she visited Abraham about once a month. According to Dorothy, she witnessed Carol's interaction with Abraham during the visits, and she and Abraham became less attached as Abraham became more attached to Dorothy. However, she also testified that Abraham "never forgot" his sisters.

Dorothy testified that she had no problem with Carol and Abraham's siblings having supervised visits with Abraham. She had an adopted daughter, and she allowed her to see her biological mother and siblings. She believed Abraham needs to see his siblings, especially because Abraham and his family are African-American, and Dorothy and the foster parents with whom Abraham was currently placed are Caucasian.

At the time of trial, Abraham was living with foster parents who also wanted to adopt him. He had been placed with the family after DFPS removed him from Dorothy's care.[17] The caseworker testified that Abraham had

_____

[17] Abraham had been found wandering near the highway while in the care of a babysitter. Dorothy contended that she had left Abraham with her brother-in-law, an approved caregiver, but that he went to sleep, leaving Abraham in the care of an unapproved caregiver. The CASA advocate testified

23

prospered in their care and that his behavior had dramatically improved. His manners, speech, and listening skills had all improved, and he was showing less defiance. The foster parents were able to meet Abraham's physical and emotional needs; they also provided a stable home and environment. He called the foster parents mom and dad and was very loving with them.

The CASA advocate testified that termination of Carol's parental rights and adoption were in Abraham's best interest. The caseworker agreed, testifying that giving Carol possessory conservatorship would not be in Abraham's best interest because of his age and need for stability and because of Carol's demonstrated inability to parent. According to the caseworker, if Carol were awarded possessory conservatorship, the visitation schedule would become more complicated, and it would impact Abraham's sense of permanency if Carol failed to visit on a regular basis. However, the DFPS caseworker and investigator, as well as Dorothy, all agreed that giving Carol supervised visitation would alleviate DFPS's concerns about medical neglect. The caseworker also testified in response to cross-examination that supervised visitation would alleviate "all concerns" and that it would be better for a child to have some contact with a parent than none at all. However, she qualified

---

that Dorothy told her she knew the brother-in-law was going to sleep and asked him to have the unapproved caregiver watch Abraham.

her answer by stating that it could emotionally scar Abraham if Carol were to continue to miss visits. She was concerned that Carol would not visit in the future because she had not visited in the past. She agreed, however, that it was good for Abraham to have continued contact with his siblings.

**C. Analysis**

Based on the above evidence, and applying the best-interest factors, we conclude and hold that the trial court could reasonably have formed a firm conviction or belief that termination of the parent-child relationship would be in Abraham's best interest. Although it was not disputed that contact between Abraham and Carol and Abraham and his siblings would benefit Abraham, it was likewise undisputed that it would be emotionally harmful to Abraham if Carol failed to maintain that contact on a regular basis. DFPS's plans for Abraham included permanent placement, and there were two potential options for adoption. Carol's home and financial situation never stabilized over the eighteen-month period when Abraham was removed from her custody, and she did not have the support of Abraham's father or, apparently, any other suitable family members to assist her in establishing the kind of stability Abraham needed. Likewise, she continued to use marijuana and failed to visit with Abraham on a regular basis. In other words, she continued to demonstrate a lack of parenting skills in the same vein as her lack of attention to Abraham's

25

medical condition for which he was initially removed. *See* Tex. Fam. Code Ann. § 263.307(b) (Vernon 2008); *Holley*, 544 S.W.2d at 371–72; *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.) ("The State's interest in establishing a 'stable, permanent home' is 'compelling,' and a parental-rights termination, when grounds authorizing it are met, serves that goal by permitting adoption."). Accordingly, we overrule Carol's fourth point.

## IV. Conclusion

Having overruled all of Carol's points, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL: LIVINGSTON, DAUPHINOT, and GARDNER, JJ.

DELIVERED: June 25, 2009